George B. Christie, Appellee, v. The Sanitary District of Chicago, Appellant.

Gen. No. 8,247.

64

Opinion filed February 3, 1930.

MACLAY HOYNE, JOHN W. BECKWITH and W. H. DIETERICH, for appellant.

THOMAS E. BOTTENBERG and BARNES, MAGOON & HORTON, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This suit is an appeal from a judgment of the Schuyler county circuit court for the sum of $109,928.12 and costs, including $10,000 attorneys' fees, recovered by appellee against appellant, for the overflow of lands, claimed in the declaration. The suit was commenced on September 5, 1923, and judgment was entered in the Schuyler county circuit court at the April term, 1927. We shall denominate the appellee as plaintiff and appellant as defendant. As there is serious controversy over the pleadings in this cause, we set out their substance quite fully.

"The declaration upon which the plaintiff went to trial consisted of three counts, the first count usually referred to as the short count was a count of trespass and was the second count in the first amended declaration and is as follows: 'And for that, also, the said defendant did from the 1st day of January, A. D. 1921, until the date of the commencement of this suit, wilfully, recklessly, unlawfully, improperly and without any authority of law, by discharging waters from a certain Sanitary District channel owned and operated by it into the Illinois River, did overflow, injure, wash away and destroy the lands of the plaintiff situate in the County of Schuyler and State of Illinois and did overflow, flood, injure and destroy the buildings and chattel property of the plaintiff and did thereby hinder and prevent the plaintiff from having the use, benefit and enjoyment thereof of said lands, buildings and chattel property in so large and ample a manner as it might and otherwise would have done, and did put the plaintiff to great cost and expense in the repair, rebuilding and reconstruction of his said

buildings, and did greatly depreciate the market value of his said lands, to-wit, the sum of Two Hundred Fifty Thousand Dollars ($250,000.00)'.''

The two additional counts in the declaration as amended are identical in the caption and statement of ultimate facts, both said counts alleging:

"That for more than ten years prior to the beginning of this suit, and from thence hitherto the plaintiff was and is possessed of and owner, and was of right entitled to the use of the following described real estate in the County of Schuyler and State of Illinois and lying adjacent to and near the Illinois River, to-wit." (Here follows description of lands.)

"That the said lands lie within the Coal Creek Drainage and Levee District of Schuyler County, Illinois, and are surrounded by a levee to protect them from the waters of the Illinois River; . . .

"That during and throughout the said period of time . . . the defendant was, and is now a Sanitary District organized under the laws of the State of Illinois. . . . That on January 1, 1903, the defendant constructed and excavated certain channels and canals from the Chicago River and Lake Michigan to Lockport, Illinois, for the purpose of causing the waters of and from Lake Michigan, Chicago River, and watersheds adjacent thereto, and the sewage from and within said District to flow into and through the said channels and canals and thence into and through the Illinois River; that on January 17, 1900, the said defendant turned the waters of and from Lake Michigan, Chicago River and the watersheds adjacent and the sewage from and within said District and from thence hitherto have been engaged in causing and do cause large and increased quantities of water from Lake Michigan, Chicago River and the watersheds adjacent thereto and the sewage from and within said District to flow through said channels and canals, by means of

intermediate streams, into the Illinois River, and that said waters and sewage so flowing through the Illinois River at a point above the said Drainage and Levee District and locality, wherein are located the works of the District and that thereby the amount of waters and sewage in said Illinois River was greatly increased in quantity during each succeeding year.

"That the defendant in the year 1900 constructed certain controlling works, provided with certain appliances wherewith and whereby the flow of water through the channels and canals could be regulated in the amount and quantity; . . . . that during the said period said defendant was able to and did regulate and control the amount and quantity of water and sewage which were thereby deposited in and caused to flow through the said Illinois River. . . .

"That by the provisions of the act of the Legislature, authority was granted to the defendant to flow and discharge waters from Lake Michigan, and from said District, through the said drainage canal and thence by divers channels and watercourses into the Illinois River and that the amount of said flowage was to be based upon the number of people resident within the District; . . . that it was required at all times to keep and maintain a regular, steady, uniform flowage, the amount of which was to be dependent upon the population of said District and was to be increased only as its said population increased; that up to a period ending five years prior to the commencement of this suit, the population of said Drainage District was not to exceed, to-wit, "A" and during the period from that date to the commencement of this suit Two Million Four Hundred Thousand (2,400,000) of people, and that based thereon and thereunder said district was authorized to discharge and did discharge through said drainage canal as aforesaid a large quantity of water, to-wit, the quantity of Four Hundred Eighty

Thousand (480,000) cubic feet per minute, which said flow of water, the plaintiff avers was ample at all times to properly dilute the sewage of said District and to keep and maintain the waters of said canal so that the same should be neither offensive nor injurious to the health of any of the people of this State.''

''That with the period beginning five years prior to the commencement of this suit, the defendant, not regarding said statute and its requirements or the laws of the State of Illinois governing and controlling the use and operation of said Sanitary District wilfully, wrongfully, improperly and unlawfully, and for the purpose not only of carrying away and diluting the sewage of the City of Chicago and the area within said Sanitary District, but also in part for the purpose of generating electrical power for the use, profit and benefit of said Sanitary District, did discharge through said Sanitary District canal a much greater flow and quantity of water from Lake Michigan, and from said District, through the Chicago River and also said Sanitary District canal than was necessary or required for the purpose of said act, or authorized or permitted by it—that is to say, to keep the water of said District in such condition that the same should neither be offensive nor injurious to the health of any of the people of this State, and vastly in excess of the amount and quantity which it was authorized and permitted to flow by and under the laws of the State of Illinois; . . . that at times the flow of water in said channel did amount to, to-wit, one million six hundred thousand cubic feet per minute, which said respective flows of the said Sanitary District of Chicago, as above set forth and averred, did exceed the flow thereof prior to the commencement of said five year period prior to the commencement of this suit, by a large amount; . . . more than had been theretofore flowed through said Sanitary District canal and channel during the

period from the commencement of the flow through said canal and ending with the five year period prior to the commencement of this suit. . . . That the effect of said excessive discharge in excess of the amount allowed by law was to raise the level of the Illinois River in times of flood and high water upon said River to a greater height than it otherwise would have been raised, to-wit, to the height of three (3) feet, and the effect of said excessive discharge in times of low water in said River was to raise the level of the water in said River to a greater height than it would otherwise have been raised, to-wit; six (6) feet above the stage of water in the Illinois River had the same been confined to the natural flow of waters in the Illinois River and the authorized flow of the defendant herein as the same had been flowing for a period prior to five years before the commencement of this suit.

"That prior to the five years before the commencement of this suit, the lands of the said plaintiff within said Drainage District had not been overflowed or flooded since the date of the construction of said levee and drainage district by the said water of the Illinois River adjacent thereto nor had its dikes and levees been overflowed or destroyed. That from and after a period beginning five years prior to the commencement of this suit, solely and entirely by reason of the unauthorized and unlawful flow and discharge from the Sanitary District of Chicago, the defendant herein, in excess of the amount which, under the laws of the State of Illinois, it might lawfully discharge into the Illinois River, as is above set forth, that the level of the Illinois River, adjacent to said lands of the plaintiff herein was so raised, heightened and elevated that the said Illinois River on April 16, 1922, and on divers other days during said period overflowed the said lands of the plaintiff above described and broke, tore down, injured and destroyed the levees and dikes protecting

said lands from the waters of the Illinois River and did cause, the waters and sewage aforesaid to stand over the lands of the plaintiff for a long time, to-wit, for one year thereafter, and thereby rendered the said lands of the plaintiff wet, untillable, sour and did destroy, and injure the buildings situate on said lands and did destroy the personal property of the plaintiff located on the said lands; . . . and did great damage to crops grown thereon, and has diminished the yield of the same and rendered the lands less fitted for tillage, use and agricultural purposes.

"That by reason of the wrongful and unlawful discharge of water from the said Sanitary District as above set forth, and the consequent maintenance of the increased level of the Illinois River, the said Sanitary District has increased the seepage from said River through said levees and dikes into and upon the lands of the plaintiff and has, during all of said period, done great damage to crops of the plaintiff grown on his said lands, and has diminished the yield of the same and rendered the plaintiff's lands less fitted for tillage, use and agricultural purposes."

Up to this point the two additional counts in the declaration are identical; the first count concludes:— "That the said wrongful and excessive discharge of said quantities of water so cast by the defendant upon, flowing over and flooding the lands of the plaintiff, caused the same, together with the buildings and personal property thereon to be injured and destroyed so that by reason thereof the plaintiff has been greatly damaged in the injury to the lands, buildings and personal property in, to-wit the sum of Two Hundred Fifty Thousand Dollars ($250,000.00)."

The second additional count concludes: "That the said Sanitary District canals and channels were constructed and operated by the said defendant under and pursuant to a certain statute of the State of Illi-

nois in that behalf, giving the said defendant power to operate said Sanitary channels and canals, but provided that said Sanitary District, the defendant herein, would be liable for all damages to real estate within or without such district which should be overflowed or otherwise damaged by reason of the construction, enlargement or use of said channels and canals, which statute is and was as follows, to-wit:''

Here follows section 19 of Sanitary District Act, Cahill's St. ch. 42, ¶ 357, which provided that: ''Every Sanitary District shall be liable for all damages to real estate within or without said district which shall be overflowed or otherwise damaged by reason of the construction, enlargement or use of any channel, ditch, drain, outlet or other improvement under provisions of this act,'' etc. . . .

''That by virtue of said statute the duty was imposed upon the defendant, with reference to the plaintiff's real estate aforesaid, not to damage or injure the same by any flow in excess of the discharge permitted and authorized by law; that by reason of the injuries done to the said plaintiff and his lands as hereinbefore recited the said Sanitary District, became, was and is liable to the plaintiff for all damages to said lands of the plaintiff which was caused by the wrongful, improper and unlawful use of its said channels and canals as is above set forth.

''That the said wrongful and excessive discharge of said quantities of water so cast by the defendant upon, flowing over and flooding the lands of the plaintiff, caused the same, together with the buildings thereon to be injured and destroyed, so that by reason thereof the plaintiff has been greatly damaged, in the injury of the lands, buildings in, to-wit, the sum of Two Hundred Fifty Thousand Dollars ($250,000.00).''

A general and special demurrer was filed to the declaration, including the first count, which does not

appear to have been passed upon and was abandoned by defendant filing pleas, of the general issue and the general plea of the statute of limitations and two further special pleas of the statute of limitations setting out the organization of the Sanitary District of Chicago and the various acts and provisions, under which is. was organized and ''that pursuant to the authority conferred upon it, it did construct a channel from a point at or near, to-wit, Robey Street in the City of Chicago, to a point near, to-wit, the City of Lockport. . . .

''That on, to-wit, the 17th day of January, A. D. 1900, it did cause the waters of Lake Michigan and of the Chicago River to flow through the said channel into the Des Plaines River and from thence into the Illinois River; that from said 17th day of January, A. D. 1900 up to the time of the commencement of the said suit, it has caused the waters of Lake Michigan and of the Chicago River drainage area to flow through its said main channel into the Des Plaines River, and from thence into the Illinois River.''

Defendant further avers that the channel so constructed, operated and used, together with the water flowing therein under the statute aforesaid was, and is a permanent public work, structure or improvement and intended to and will continue for all time.

That the lands described in plaintiff's amended declaration are and were so situated on, to-wit, January 17, 1900, that any and all waters introduced by this defendant into the Illinois River . . . would of necessity cause a permanent injury and damage to said lands; and that said injury complained of . . . did not, nor did any or either of them, accrue to the plaintiff at any time within five years next before the commencement of this suit. . . . And the second special plea of the statute of limitations alleges, in addition:—that the creation of the organization of the

Sanitary District under the act passed by the general assembly, the construction of a channel of the capacity provided by said act, the turning in of the waters from Lake Michigan through said channel on the 17th day of January, 1900, and the continuous flow of said waters from the time the same were turned in, up to the time of the commencement of the suit that the said work was a permanent structure. The plea then avers:

"That the population of The Sanitary District of Chicago, on January 17, 1900, at the time said main channel of this defendant was placed in operation was, to-wit: 1,638,000.

"The population of said Sanitary District of Chicago was at the time of the commencement of this suit in excess of 3,000,000 people and had been approximately 3,000,000 people for ten years prior to the commencement of said suit.

"That at the time that the said canal was opened the sewage from said District was caused to flow through said canal and that in order to comply with the provisions of the statute it was necessary to cause water from Lake Michigan and the Chicago River to be turned into the said canal in an amount of not less than 20,000 cubic feet of water for each 100,000 of the inhabitants of said District and that said quantity of water so required by the statute was caused to be turned into the said canal.

"That at no time in said declaration mentioned has the flow of said Sanitary District exceeded the amount authorized by the said statute.

". . . That the lands described in plaintiff's amended declaration, and each part and parcel thereof is and was, so situated, that more than ten years prior to the filing of the amended declaration said water did necessarily and inevitably permanently injure said lands and that the said injury complained of by the

plaintiff in his amended declaration constitutes, and is but one cause of action or right of recovery against this defendant, to-wit: a right to recover damages for a permanent injury to said lands, which right of action accrued to the plaintiff more than ten years prior to the filing of the amended declaration herein.''

Plaintiff filed a replication to the seventh plea in which he denied the opening of the canal on January 17, 1900, would ''of necessity'' cause a permanent injury and damage to said lands, reasserted that the cause of action did accrue within five years next before the commencement of the suit.

Plaintiff filed a further replication alleging:

''That the said population of the said defendant on January 17, 1900, was not, to-wit: One Million Six Hundred Thirty-eight Thousand (1,638,000).

''That the population of said Sanitary District, defendant, was not, at the commencement of this suit, in excess of three million (3,000,000) people and had not been approximately three million (3,000,000) for ten (10) years prior to the commencement of this suit.

''That at all times in said declaration mentioned, the flow of the defendant district has exceeded the amount authorized by said statute.

''That each piece and parcel of the lands described in the declaration to which said plea was filed, was not so situate more than ten (10) years prior to the filing of said amended declaration, that said water so discharged by said defendant through its said canal would necessarily and inevitably permanently injure said lands as charged in said plea and because the right of action sued for by the plaintiff did not accrue to the plaintiff more than ten (10) years prior to the filing of said amended declaration.

''That the several supposed causes of action in said amended declaration, and each of them, did accrue to the plaintiff within five (5) years next before the

commencement of this suit in manner and form as the plaintiff hath heretofore alleged.''

A motion was made by the defendant that plaintiff be required to elect whether he will proceed for tort or permanent damages. No ruling was had on this motion, the court reserving its ruling, and the motion was not acted upon, until the court instructed the jury. Upon the trial no proofs were offered as to the amount of waters turned, by defendant, into the Sanitary channel during any period, except the period of five years, immediately preceding the commencement of this suit. It is conceded by plaintiff that there were no such proofs submitted and that such charge in the declaration is mere surplusage and does not have to be proven, citing *Jones v. Sanitary District of Chicago,* 265 Ill. 98. The court did say in this case at page 100: ''The statute creates liability against the district for all damages, that may result to any land owner by reason of turning the water from said district into the Illinois River. The liability does not depend upon any wrongful purpose or negligent conduct on the part of plaintiff in error. The allegation that the action of plaintiff in error was wrongful and negligent is surplusage.'' Plaintiff has mixed substance with form. The court did not hold that allegations as to flow in the channel, the five years immediately preceding the bringing of the suit, compared with the flow of the preceding five years was surplusage. In *Kuhne v. Sanitary District of Chicago,* 294 Ill. 430, 435, it is held: ''In order to state a cause of action, it is necessary for the plaintiff to show that the acts of the defendant within the five years prior to the commencement of the suit have created a condition different from that existing prior to the five-year period, and that as a result of the condition thus created within the five-year period, damages have accrued to the plaintiff.'' It is thus seen that the allega-

tion is not surplusage, in cases of this kind, but an essential allegation, which plaintiff is bound to prove. An analysis of plaintiff's declaration shows that the issues are narrowed down to four specific charges, namely:

First: A greater flowage than the law allows, based upon population.

Second: A flowage not "continuous" as the statute required.

Third: A flowage for the purpose of creating electricity and not to dilute sewage; and

Fourth: A greater flowage in the five years before suit was commenced than in the five preceding years; any one of which would have stated a good and sufficient cause of action. The plaintiff has abandoned the fourth allegation, upon which no proof was offered and desires to have it treated as surplusage, citing *Jones v. Sanitary District, supra,* and stating in his brief: "the allegations as to the difference in flowage for five years before the suit was begun and the flowage for five years before that time is surplusage and the appellee is not bound to prove it," admits, therefore, that there is no proof of any difference in flowage in the five years preceding the filing of the suit and the period ending five years prior to the filing of the suit, which, under plaintiff's contention, leaves three remaining issues:

First: A greater flowage than the law allows, based upon population.

Second: A flowage not continuous as the statute required, and

Third: A flowage for the purpose of creating electricity and not to dilute sewage.

In *Jones v. The Sanitary District, supra,* the cause was commenced in 1905 and no question of the statute of limitations or a five-year period entered into the case. In *Kuhne v. Sanitary District, supra,* we

have quoted the language of the court, showing what is necessary to be set out, to state a cause of action. There is nothing in this case to indicate that there was any increased flow of water from the Sanitary District canal into the Illinois River during the five years preceding the commencement of this suit than had existed or was discharged in the preceding five years, and it follows that the statute of limitations had barred any action upon the extent of the flowage as it existed during the five-year period prior to this suit.

As to the amount of water that the defendant was permitted, under the law, to flow into the Sanitary District channel and the Illinois River, it was held in *Kuhne v. Sanitary District, supra*: "It will thus be seen from an examination of the act under which the defendant is organized that it is authorized to flow a sufficient amount of water to properly dilute the sewage and render the water not offensive nor injurious to the health of any of the people of the State, provided that the amount of water to be flowed shall in no case be less than 20,000 cubic feet per minute for each 100,000 of the population of the district. Plaintiff contends that 20,000 cubic feet of water is the maximum amount of water authorized to be flowed into the channel and that flowing a greater amount through the channel is unauthorized and therefore unlawful. That this contention cannot be sustained seems too plain to require argument. If the defendant flowed through its channel an unreasonably large amount of water, thereby causing damage to the plaintiff's property, it would no doubt be liable for such damage." *Coal Creek Drainage & Levee Dist. v. Sanitary District,* 336 Ill. 11.

As to the continuity of the flow, section 20 of the Sanitary District Act, Cahill's St. ch. 42, ¶ 359, after providing for the quantity of the flow that shall be

turned into the channel, according to population, and the increased flow provided for, the act provides only —"and shall thereafter maintain the flow of such quantity of water." We conclude from this language that the flow need not be maintained, absolutely uniform and continuous, but that it is to be maintained, to the end that all sewage shall be properly diluted and the health of the people be preserved. *Coal Creek Drainage & Levee Dist. v. Sanitary District, supra.*

The declaration charges: "The plaintiff avers that by the provisions of the said act of the legislature, authority was granted to the defendant to flow and discharge waters from Lake Michigan and from said District through said drainage canal and thence by divers channels and water courses into the Illinois River and that the amount of said flowage was to be based upon the number of people resident within the district; that there was required to be a steady, uniform flowage based upon the said population with the right and authority to increase the same as the said population increased." Plaintiff does not allege that this operation of the canal, in this manner caused the water of the Illinois River to raise, but charges: "With the period beginning five years prior to the commencement of this suit the defendant not regarding said statute and its requirements or the laws of the State of Illinois, governing and controlling the use and operation of said Sanitary District wilfully, wrongfully, improperly and unlawfully and for the purpose not only of carrying away and diluting the sewage of the City of Chicago and the area within said Sanitary District but also in part for the purpose of generating electrical power for the use, profit and benefit of said Sanitary District, did discharge through said Sanitary District canal a much greater flow and quantity of water from Lake Michigan and from said district through the Chicago River and also said Sanitary

District canal than was necessary or required for the purposes of said act or authorized or permitted by it."

The declaration further alleges: "That the effect of said excessive discharge in excess of the amount allowed by law was to raise the level of the Illinois River in times of flood and high water upon said river to a greater height than it otherwise would have been raised, to-wit to the height of three (3) feet, and the effect of said excessive discharge in times of low water in said river was to raise the level of the water in said river to a greater height than it would otherwise have been raised, to-wit: six (6) feet above the stage of water in the Illinois River had the same been confined to the natural flow of waters in the Illinois River and the authorized flow of the defendant herein as the same had been flowing for a period prior to five years before the commencement of this suit."

The declaration then alleges: "That from and after a period beginning five years prior to the commencement of this suit, solely and entirely by reason of the unauthorized and unlawful flow and discharge from the Sanitary District of Chicago, the defendant herein, in excess of the amount which, under the laws of the State of Illinois, it might lawfully discharge into the Illinois River, as is above set forth, that the level of the Illinois River, adjacent to said lands of the plaintiff herein was so raised, heightened and elevated that the said Illinois River on April 16, 1922, and on divers other days during said period overflowed the lands of the plaintiff, etc." In plaintiff's *ad damnum* clause in the declaration he alleges: "The plaintiff further avers that said wrongful and excessive discharge of said quantities of water, so cast by the defendant", caused the damage.

It will be seen that the declaration nowhere charges that the damage resulted from a flow that was not con-

tinuous. Neither does the declaration charge that the cause of the overflow was the water flowed for the primary purpose of creating electricity and not to dilute sewage. We have quoted all the language used by the pleader, with reference to the creating of electrical power and we assume that any and all water passing through the channel, to dilute sewage or otherwise, might be, "in part," used to create electrical power and a charge of an excessive flow of water, either to dilute sewage or create electrical power, amounts to no more than a charge of an excessive flow of water, through the channel, whatever the purpose might be. The question in all cases, would be, how much water was required to dilute the sewage? The statute fixes a minimum amount. The charge that the flow was excessive, and that it was made excessive to create electrical power, merely argues a motive to make the flow excessive, and does not charge a wrongful act, unless the flow was, in fact, excessive, in which case, the excessive flow would be a wrongful act and render the defendant liable, if injury resulted. This being the case, and the defendant being a permanent structure (*Suehr v. Sanitary District of Chicago*, 242 Ill. 496) the only issue in the case, not plainly barred by the statute of limitations, was the charge that defendant, during the five-year period before the commencement of this suit, had greatly increased its flow of water in the channel, over and above the flow used in the previous five-year period, and to an excessive and unnecessary amount and thereby caused damage. There were no proofs offered tending to show that the flowage had been increased or that the flow was excessive and the court at the close of all the testimony should have instructed the jury to find a verdict for the defendant, in accordance with the rule laid down in *Kuhne v. Sanitary District, supra.*

Inasmuch as minds may differ as to the technical construction to be given to the pleadings in this cause

and the cause is of major importance to the parties interested, we shall go further into the facts and the merits of the cause, as shown by the proofs, to determine whether, if the pleadings were given a different construction, the judgment entered for plaintiff could be permitted to stand. It is shown that the flood water that passed under the bridge at Beardstown, and overflowed plaintiff's land in April, 1922, came from numerous sources; from defendant's canal and from all the streams and rivulets in the watershed, accelerated and retarded by various unnatural flowages and obstacles and specially accelerated by an unusual down pour, in the entire district, nearly one-half of the water going under the Beardstown bridge, being gathered from the valley of the Sangamon. Plaintiff contends that all persons and corporations contributing unnatural waters to this flood were joint tortfeasors and liable for all damages accomplished by the flood.

Plaintiff's instruction number 3 informs the jury: "In one count of the said declaration the plaintiff charges that the defendant from and after January 21, 1921 until the commencement of this suit, which was commenced September 5, 1923, wilfully, recklessly, unlawfully, improperly and without any authority of law by discharging waters from its said Sanitary District Canal, owned and operated by the defendant, into the Illinois River, did overflow, wash away and destroy the lands of the plaintiff situated in Schuyler County, Illinois and did overflow, flood, injure and destroy the buildings of the plaintiff and did thereby hinder and prevent the plaintiff from having the use, benefit and enjoyment of said lands and buildings in so large and ample a manner as he might and otherwise would have done, and did thereby greatly depreciate the market value of said lands.

"You are further instructed that under this count of the declaration, if the plaintiff has established the same by the greater weight of the evidence as re-

quired by these instructions, the plaintiff is entitled to recover from the defendant the difference, if any such is shown, in the fair cash market value of said lands shortly before the injury and damage to the same referred to in said count in said declaration took place, and the fair cash market value of the same shortly after such injury and damage took place, as far as the same is shown by the evidence and you are instructed that the lands referred to in this count of the declaration are the lands described in these instructions.'' And again the court instructed the jury by plaintiff's ninth instruction: ''And, if you, the jury, believe from a preponderance of the evidence in this case that the real estate of the plaintiff described in these instructions or any part thereof was overflowed or otherwise damaged as charged in the declaration or some count thereof, and that the same were not so situated on January 17, 1900, that any and all waters introduced by the defendant into the Illinois River through and by reason of the construction, operation or use of the defendant's channel and works referred to in the evidence, would of necessity and did stand upon, soak and permeate the said lands of the plaintiff, and that a continuance of a flow of said waters so cast into the Illinois River by the defendant, would and did cause a permanent injury and damage to said lands as set forth in the defendant's seventh or eighth plea, then you should find the defendant guilty and assess the plaintiff's damage as directed in these instructions.'' And the court refused to give defendant's thirteenth instruction, as follows: ''The jury are further instructed that the plaintiff in this case has the burden of showing by the greater weight of the evidence that the defendant has caused injury or damage alleged in plaintiff's declaration by illegally flowing from Lake Michigan water in excess of the amount required under the law through its

artificial channel into the Illinois River, and that before he can recover he must show that such illegal act of the defendant was the direct and proximate cause of the alleged injury and damage described in his declaration. If in this case the condition of the proof is such that you must resort entirely to mere speculation or conjecture for the purpose of determining whether the injury or damage claimed resulted from the alleged illegal acts of the defendant or resulted from some other cause or causes not charged in the declaration, your verdict should be for the defendant.'' It is not and never has been the law of Illinois, that tortfeasors, acting independently of each other and not jointly, were each liable for all of the damage done by all. Each is only liable for the distinct damage done by each and no more. *Westgate v. Carr*, 43 Ill. 450. Numerous instructions given for plaintiff were erroneous and the defendant submitted to the court a considerable number of instructions, which should have been given, but were refused. This was error.

It is contended now by plaintiff, that upon January 17, 1900, when the waters of Lake Michigan were first turned into the Illinois River, by the defendant, that plaintiff's lands were not so situated at that time or at any time since, until April 16, 1922, that plaintiff could sue for permanent damages. It is contended that the flood of April 16, 1922, is the ''first invasion'' of plaintiff's land, after the opening of defendant's canal, that afforded plaintiff the opportunity to bring an action, under the statute, to recover the permanent damage to his lands by the diversion of said waters as provided in the statute. This claim, on the part of plaintiff, involves substantially all of the competent testimony introduced in the cause, to determine the merits of the claim and incidentally to determine whether the rule laid down in the *Kuhne* case applies

to the facts in this case. This suit finally resolved itself into a suit to recover permanent damages, under the statute, to plaintiff's lands, consisting of 2,000 acres lying within the confines of the Coal Creek Drainage District, which had been organized in the year 1898. The proofs are substantially as follows: The plaintiff made proof of ownership of the lands described in the declaration by quitclaim deed from Jesse Lowe and wife to the plaintiff dated August 21, 1913. The plaintiff testified that he had claimed ownership to the one-half interest since 1895; that prior to the deed from Lowe, he and Lowe owned the land jointly; that there were no deductions made for rights of way conveyed from various tracts; that the plaintiff was a civil engineer and had been in the contracting business prior to the time that he became a farmer; that the plaintiff came to Beardstown in 1895 prior to which time he was located in Chicago, was in the contracting business and had just finished building part of the drainage canal of the Chicago Sanitary District; that his firm, Christie and Lowe had built two sections of about 4,000 feet each; that his firm designed and constructed the Bear Trap Dam and Sluice Gates at the end of the canal. Plaintiff made proof that the lands were located in the Coal Creek Levee and Drainage District in Schuyler county, Illinois, the works of which district consisted of a levee on three sides; that the Chicago, Burlington & Quincy Railroad embankment formed a protection from about 300 feet north of the bank of the Illinois River near Beardstown to Frederick; that the railroad embankment was there at the time the district was formed; the drainage district was formed in 1898; that at the time the works of the Coal Creek Drainage District were constructed the drainage district filled in about one-quarter of a mile of trestle of the Chicago, Burlington & Quincy Railroad; that prior to the commencement of the works of the Drainage District all

the lands were subject to overflow; that in outlining the construction of the Coal Creek Drainage District they adopted a Datum Plane with reference to which the levees were constructed. 100 on the Datum Plane represented the high water of 1844, which equaled a flood stage of 22.5 stage on the river; that the levees were built to an elevation of between 103 and 104 Coal Creek datum; that the elevation of the water of 1844 was obtained from information furnished by men who were living in 1844; they were given to the plaintiff by residents of the community; that plaintiff got the high watermark of 1844 from a known datum, consisting of a nail in a tree an old settler drove in the tree in 1844; that it was a tree standing on a little knoll just by the side of the Beardstown Wagon Bridge; that the nail was sticking out about one-half inch; that the nail was pointed out to the plaintiff some time in 1895 or 1896; that in 1909 and again in 1913 the levees of the district were raised to a higher elevation, being raised to an elevation of 105 Coal Creek datum in 1913; that the railroad embankment was raised after 1898 to an elevation of 102 or 103 Coal Creek datum; that there were 41 miles of tile on the lands ranging in size from 5 to 12 inches; there were 9 sets of buildings all together located on different parts of the premises.

Plaintiff made proof of the construction of the canal of the Sanitary District of Chicago from Robey Street in the City of Chicago to Lockport, Illinois; the canal was 160 feet wide, 24 feet deep through the rock section, 200 feet wide on the bottom with sloping sides through the earth section, and was about 38 miles long; that at the lower end of the canal were controlling works for letting the water out of the canal into the Des Plaines River, which consisted of a movable dam and sluice gates which could be operated to let the water out at varying quantities; the movable dam was known as the Bear Trap Dam; that the

canal as originally constructed had as its only outlet the Bear Trap Dam and some sluice gates; that an extension was constructed some 5 to 7 years after the canal was opened for a distance of about two miles; that at the lower end of this extension two dams, one 48 feet and one 12 feet, and also a lock were constructed; that prior to the time that this extension was built and the lock constructed boats could not pass down the Sanitary District canal into the I. & M. canal; the locks were 40 by 120 feet; that the 48-foot dam and 12-foot dam work on the same principle as the Bear Trap Dam and are located adjacent to this lock; that at the beginning of this extension there is located a dam called the Butterfly Dam; it is pivoted in the center and can be turned to shut the water off entirely from the original portion of the canal and the extension; in case of any accident to the lock or other dams they could shut that Butterfly Dam and it would shut off the flow; that at the lower end of the two-mile extension there is a power house which is utilized to develop electricity from the flow of the water and consisted of an installation of 7 turbines, driving electrical generating machinery. It is constructed of steel and concrete; that the maximum discharge of the canal is around 10,000 or 11,000 cubic feet if all openings were opened up to their full capacity; that there is no place from Robey Street to Lockport where any part of the water escapes from the canal other than the controlling works; that the Sag Channel was opened in August 1922, is 20 feet deep, 40 feet wide on the bottom, 100 feet wide on the water surface; that the Sag Channel constructed by the Sanitary District takes up to 2,000 second feet flow and drained 300 or 400 square miles when the channel was first opened; that in April, 1922, none of the 400 square miles in the Calumet country found its way by drainage into the Sanitary District canal. This was for-

merly a tributary to the I. & M. canal, and drained into the I. & M. canal practically since its construction; that it flowed into the Des Plaines River before the I. & M. canal was built; there is a spillway at Willow Springs, 8 miles outside of the boundary of the Sanitary District and above the controlling works, for the overflow water of the Des Plaines River to spill into the canal. It is a concrete dam 200 feet long in the side of the river right at the edge of the canal; that when there is high water in the Des Plaines River a portion of it spills over into the canal.

Plaintiff made proof of the discharge of the Sanitary District canal during the year of 1922 by offering in evidence plaintiff's Exhibit 6, being the daily record of the outflow of the various openings at the lower end of the canal for the year 1922 (that part of Exhibit 6, from March 1, to April 13, giving the discharge in half-hour periods); that the discharge of the different openings at the controlling works contained in the Big Book were correct with the exception that 12 per cent should be added to the turbine flow to compensate for loss of efficiency in the water wheels since their installation; also that there is an error in the record of April 11 of 361,000 cubic feet per minute for the 12-foot dam, which should have been 36,100 instead of 361,000, which would make the flow for that period 652,800 instead of 977,700 and would make a mean flow for that day as shown by the record of 631,740 cubic feet per minute.

Plaintiff made proof of the canal flow at Lockport in acre feet in 24-hour periods, the number of cubic feet per second multiplied by 1,983 would represent the acre feet discharge in 24 hours; dividing the acre feet by 2 would produce approximately the second feet. These computations were made from plaintiff's Exhibit 6, showing the discharge at the controlling works for 1922 with 12 per cent added to the turbine

flow. The canal flow at Lockport in acre feet per day are contained in a column under that heading showing the discharge for March 8, 1922 to April 14, 1922, and show the daily discharge to be as follows:

"Mar. 8, 16,364; Mar. 9, 16,179; Mar. 10, 17,065;
 Mar. 11, 18,874; Mar. 12, 16,965; Mar. 13, 15,798;
 Mar. 14, 16,589; Mar. 15, 16,737; Mar. 16, 16,595;
 Mar. 17, 16,946; Mar. 18, 17,382; Mar. 19, 17,881;
 Mar. 20, 18,533; Mar. 21, 20,520; Mar. 22, 17,722;
 Mar. 23, 16,860; Mar. 24, 16,444; Mar. 25, 18,045;
 Mar. 26, 18,945; Mar. 27, 18,224; Mar. 28, 18,093;
 Mar. 29, 17,985; Mar. 30, 18,581; Mar. 31, 20,407;
 Apr. 1, 20,350; Apr. 2, 16,038; Apr. 3, 19,036;
 Apr. 4, 18,579; Apr. 5, 18,419; Apr. 6, 17,748;
 Apr. 7, 17,071; Apr. 8, 16,894; Apr. 9, 16,650;
 Apr. 10, 18,210; Apr. 11, 22,743; Apr. 12, 17,704;
 Apr. 13, 17,110; Apr. 14, 16,551";

that the sewage present in the canal flow amounted to 1,500 cubic feet per second and that the sewage was included in the discharge measurements shown by Exhibit 6; that if the sewage was deducted from the total shown the flow would be 90,000 cubic feet per minute less.

Plaintiff made proof of the population of the Sanitary District, from the United States Census Bulletin for the year 1920, showing the population of counties and cities in the State of Illinois (the population of the Sanitary District not being given) and from that computed the population of the Sanitary District by prorating the townships partly within and partly without and also by deducting therefrom the population of the villages and towns within the Sanitary District which do not sewer into the Sanitary District, proof showing that the population ascertained in that manner for the Sanitary District of Chicago for the year 1920 was 2,887,914.

Plaintiff made proof of the stages of the water in the Illinois River during the year 1922 at Beardstown, Havana, Peoria and Peru by offering in evidence certified copies of the records kept by the United States weather bureau. He also made proof in like manner of the record of the gauge readings for the upper Copperas Creek Lock kept by the United States engineering department for the year 1922. He also made proof of the daily gauge readings for the year 1922 at Morris, Peoria, Henry, Peru, Havana, Beardstown and Pearl by offering certified copies of the record kept by the United States weather bureau for those gauging stations. He also made proof of gauge readings for the year 1922 at Chicago, Burlington & Quincy Railroad bridge in charge of the United States engineering department at Beardstown, Illinois. Plaintiff also made proof of gauge readings for the year 1922 at the wagon bridge at Pekin, Illinois, by the record kept by the United States engineering department. This evidence tended to prove that the river made a continuous rise at all the gauging stations reported from the 8th day of March, 1922, to the time that the river reached its flood crest, which occurred at Peru on the 13th day of April; at Peoria on the 15th day of April; Havana on the 20th day of April and at Beardstown on the 20th day of April. He made proof of the topography of the Illinois River Valley as the same existed in 1902–1904 by the introduction of plaintiff's Exhibit 7, which was a series of maps giving the contours of the Illinois Valley, made under the direction of the federal government; it being a map of the Illinois and Des Plaines Rivers from Lockport, Illinois to the mouth of the Illinois River in 58 sheets including an index and made under the direction of the board of engineers consisting of Colonel O. H. Ernst, Lieutenant Colonel Chas. J. Allen, Major Thos. J. Casey, and Major James L. Lusk, all of the corps

of engineers of United States army by J. W. Woermann United States Assistant Engineer. The defendant introduced various sheets of the same map upon which were sketched in red ink the location of levees constructed since 1904; plaintiff made proof of discharge of the Sanitary District canal by the introduction of the daily discharge records from October 1, 1920 to December 31, 1920, and from January 1, 1921, to December 31, 1921, and from January 1, 1923, to September 5, 1923, this together with defendant's Exhibit 6 showing the discharge for the year 1922 was all the evidence introduced as to the discharge of the canal.

The plaintiff made proof of the discharge of various tributaries to the Illinois River and of the discharge of the Illinois River at various points by the introduction of plaintiff's Exhibit 8 being a publication of the geological survey of the Department of Interior of the United States of America being a copy of Water Supply Paper 545 pertaining to the surface water supply of the United States for the year 1922 of the upper Mississippi River basin and which paper was certified to be a true copy of the original report made by the United States geological survey under the authority of the laws of the United States and officially published and on file in the geological survey of the Department of Interior. He proved by Water Supply Paper 545 the daily discharge of the Illinois River for the year ending September 30, 1922, at Morris, Illinois, Peoria, Illinois, Havana, Illinois, and Beardstown, Illinois. He made proof by Water Supply Paper 545 of the daily discharge for the year ending September 30, 1922, of the Kankakee River at Momence, Illinois, and at Custer Park, Illinois; the daily discharge of the Des Plaines River for the year ending September 30, 1922, at Lemont, Illinois, and at Joliet, Illinois; the daily discharge for the year ending September 30, 1922, of the Fox River at Algonquin, Illinois, and at Wedron,

Illinois; the daily discharge for the year ending September 30, 1922, of the Vermilion River near Streator, Illinois, the Mackinaw River near Green Valley, Illinois, the Spoon River at Seville, Illinois; the daily discharge for the year ending September 30, 1922, of the Sangamon River near Monticello, Illinois, near Riverton, Illinois, near Oakford, Illinois, and of the South Fork of the Sangamon River near Taylorville, Illinois; the daily discharge for the year ending September 30, 1922, of Crooked Creek at Ripley, Illinois, and of the Macoupin Creek near Kane, Illinois. Plaintiff also made proof of the comparison of discharges of the Des Plaines and the Kankakee Rivers above Morris from March 10 to April 16, 1922. He made proof by Water Supply Paper 545 that flood conditions existed along the Illinois River and all of the tributaries during the last half of the month of March and the 1st to the 16th days of April; that the Kankakee River at Custer Park increased in discharge from 3,150 cubic feet per second on the 10th day of March to 30,200 c. s. f. (cubic feet per second) on the 12th day of April; that the Fox River showed a discharge during the period from April 1st to April 16th of an average of 2,500 c. s. f. as against the discharge in September of 111 c. s. f.; that the discharge of the Vermilion River on April 11 was 12,400 c. s. f. as against the discharge recorded in September of from 6 to 1 foot per second; that the Mackinaw River showed a discharge during the month of April on the 11th, 12th and 13th of approximately 6,000 c. s. f. as against the September flow of from 30 and 40 c. s. f.; the Spoon River showed a discharge on the 12th day of April in excess of 5,000 c. s. f. as against a discharge during the month of September as low as 18 c. s. f.; that the discharge of the Sangamon River at Oakford some 25 miles from the confluence with the Illinois, from the 1st to the 16th days of April increased from 17,700 to 33,800 cubic feet per second; that the dis-

charge on the 9th was 21,300 and the 15th was 33,800 c. s. f.; that the normal discharge for July was approximately 500 c. s. f.

The plaintiff proved by Water Supply Paper 545 that on April the 15th, the day before the railroad embankment broke that the discharge into the Beardstown Reach of the Illinois River from the Sangamon was 33,800 cubic feet per second and that the discharge of the Illinois River at Havana which carried the increment of the Sanitary District and the flood waters of the Des Plaines, Kankakee, Fox, Mackinaw, and Spoon Rivers and other tributaries on the same day was 59,500 cubic feet per second; that more than 36 per cent of the discharge into the Beardstown Reach on the 15th day of April came from the Sangamon River. He made proof of the appearance of the water, six or seven witnesses testifying that the water in the vicinity of the lands described in the declaration became clear from the 10th to the 16th of April, some testifying that five or ten days before the breaking of the railroad embankment the water was not muddy, you could see through quite a way in the vicinity of Beardstown; that at Browning four miles above the land in question, the water was of a milky nature, milky-clear at times; that the river rose continuously from April 1st to April 16th; that the rise was a varying rise, would rise more during certain periods than at others; that the Coal Creek Drainage and Levee District had been overflowed prior to April, 1922; that on Saturday evening before the morning when the levee broke there was a little water going over the ties from the overflow of the sandbags; that the break occurred in the railroad embankment about 7 o'clock on the morning of April 16; that prior to April 16 the Chicago, Burlington & Quincy Railroad Company had men and work trains working to protect the railroad embankment.

Plaintiff offered in evidence plaintiff's Exhibits 10, 11, 12 and 13 compiled by a witness by the name of John Goodell who purported to tabulate for three reaches in the river, one from Peoria to LaSalle, one from Peoria to Havana and one from Havana to Beardstown the elevation of the reach, the discharge, the storage, percentage of canal flow and riders and velocity; these tabulations were made for the purpose of determining what the witness called the riders which the witness stated was the amount of water which goes along with the canal water due to the canal water's presence; that to determine storage he computed the area of the different reaches of the river and multi-plied that by the rise and reduced the same to .acre feet; that he obtained the area from the Woermann map and the rise from the gauge readings in evidence; that for the canal discharge he used the Sanitary District records contained in plaintiff's Exhibit 6; that in determining the discharge of the Illinois River or any of its tributaries the plaintiff used the information contained in Water Supply Paper 545 as introduced as plaintiff's Exhibit 8; that he made all of his compu-tations and tables based upon the flowage records or entries as shown in the discharge records from March 10 to April 16; that he based his estimates on the figures in the book after he had added 12 per cent to the turbine flow; that he made no computations or tabulations except as shown by Exhibits 10, 11, 12 and 13; that his tables were based upon assumption that the flow records disclose an excess flowage from the Sanitary District Canal of over 10,000 c. s. f.; that no deductions were made for any water coming into the canal from the Willow Springs Spillway nor were any deductions made on account of sewage present in the canal flow; that in making the computations and tabu-lations contained in Exhibits 10, 11, 12 and 13 he was assisted by his associate A. D. Millard, his office em-

ployees and by Mr. Pickels of the University of Illinois; that from these exhibits he was able to compute the effect of the flow of the Sanitary District Canal on the flood stage of the Illinois River at Beardstown on April 15 and 16, 1922; that he had made such computations and the effect was three and nine-tenths (3.9) to four (4) feet and that the excess flowage as shown by the discharge records of over 600,000 cubic feet per minute (10,000 c. s. f.) amounted to 6 inches; that 6 inches would not be the effect over a sustained flow of 600,000 cubic feet per minute that in computing the excess flow no attention was paid and no deduction was made for the half hour periods for which the flow was less than 600,000 cubic feet per minute.

Plaintiff made proof of six items of damages:

A. Damages to personal property.

B. Damages to the buildings located on the premises.

C. Damages to bridges.

D. Damages to tile drains.

E. Proof of the rental value of the lands for 1921 and 1922.

F. The difference in the market value of the lands before April 1922 and after April 1922 up to September 3, 1923.

Plaintiff also made proof that after the lands were overflowed and the works of the drainage district reconstructed, there was nothing to interfere with the abundance of yield other than the interference of the filling up of the tile; that the cause of the decline in the market value of the lands was the fact that the land was overflowed and that the Illinois River was attaining a higher flood stage than before; that the land had been interfered with prior to 1922; that the people were just getting over the prejudice created by the flood of 1913 when the river rose to the elevation it did in 1922 and created another prejudice; that the crop raised in 1923 was a very good crop but on account

of the rainy season coming in harvest time they were unable to save much of the crop. .

Motions were made by the defendant to strike from the record all evidence in reference to the appearance of the water; all the evidence of the witness Goodell in which he estimated the effect of the flowage of the Sanitary District Canal at Beardstown, Illinois; all evidence with reference to the population of the district; all evidence with reference to the costs of relaying the tile located on the lands of the plaintiff; all evidence in reference to the costs and repair of roads and bridges located on the lands of the plaintiff; all evidence in reference to the difference in the market value of the lands from the period prior to April 1922, the period after April 1922, which said motions were overruled by the court. The testimony of the witness Goodell, being based upon a pure assumption, which was not warranted by the proofs, should have been stricken out. A motion was made at the close of the plaintiff's evidence to instruct the jury to find the defendant not guilty, which motion was denied.

Defendant made proof of the various stages of the Illinois River for the year 1904 at Grafton, Kampsville Lock, Kampsville Lock above dam, Pearl, Valley City, Meredosia, LaGrange Locks below dam, LaGrange Locks above dam, Beardstown, Havana, Copperas Creek below dam, Copperas Creek Lock above dam, Kingston Mines, Pekin, Peoria, Chillicothe, Lacon Henry Locks, LaSalle, Morris, Joliet, the Kankakee Aqueduct Feeder below the mouth of the DuPage River, at Jackson Creek, at Joliet above power dam, at Joliet below power dam, at the Illinois Michigan Canal at Joliet, Lockport and at Riverside. Defendant made proof of the discharge measurements of the Illinois River for the year 1904 at Twelve Mile Island near the lower end of the river, at Pearl, Beardstown, Havana, Peoria, Henry, LaSalle, Ottawa and near Divine. Defendant made proof of gauge read-

ings for the year 1922 at Grafton, Illinois, Kampsville Lock, Valley. City, Meredosia, LaGrange, LaGrange upper level, Copperas Creek Locks. He made proof of the construction of levees as the same existed in 1922 and as the same had been constructed since 1904 from Beardstown to Grafton, these levees being located on defendant's Exhibits 91 to 124 inclusive; defendant made proof by John W. Woermann that in making the survey of 1902 and 1904 there was noted and platted all embankments and levees that existed in the Illinois Valley and that in 1904 there were six drainage districts protected by levees, three medium sized ones and three small ones; the one farthest up the river was the La Marsh across the river from Pekin, the next was the Lacey across the river from Havana and the third was the Coal Creek opposite Beardstown; that in addition there were three small districts down near the mouth of the river between Pearl and Kampsville, one adjoining the river bank and the other two back away from the river bank; that these were all the drainage districts that existed at the time the survey was made. Defendant made proof that the distance from the mouth of the Chicago River at Lake Michigan to the mouth of the Illinois River is 327 miles; that in the six miles from Chicago River to the south branch there is a fall of one and a half feet; that from Robey Street to the head of the drainage canal at Lockport the fall is from three to five feet, depending upon the level of the lake; that there is a drop at the power house of from 30 to 35 feet depending upon the flow through the canal and the stage of the water below the power house; that from the power house to the Des Plaines River, a distance of 18 miles, there is a fall of 52 feet; that from the mouth of the Des Plaines River to LaSalle, a distance of 50 miles, the fall is 54 feet; that from Marseilles to Peoria, a distance of 63 miles, the fall is about three

feet; that this reach of the river is almost a lake; that from Peoria to Beardstown, a distance of 62 miles, the fall is 25 feet at low water.

Defendant proved that the discharge of the Illinois River at Beardstown, Illinois, during the flood which occurred in 1904 at a rive stage of 20 feet on the Beardstown gauge was 115,000 cubic feet per second; that a flood occurred in the Illinois River which reached its highest flood stage on April 4, 1904, at Beardstown; that the maximum discharge measurements recorded for the flood of 1904 at different points along the Illinois River were as follows: At Morris, Illinois, 67,800 c. s. f.; at Ottawa, Illinois, 85,000 c. s. f.; at Peoria, Illinois, 90,000 c. s. f.; at Havana, Illinois, 100,000 c. s. f.; at Beardstown, Illinois, 115,000 c. s. f., and at Pearl, Illinois, 117,000 c. s. f.; that the flood stage of the 1904 flood at Peoria was 23 feet, at Havana 19.9 feet, at Beardstown 20 feet and at Pearl 19.4 feet; the flood of 1904 was greater in volume and discharge than the flood of 1922; that the maximum discharge of the 1922 flood at Morris, Illinois, was 60,000 c. s. f.; that the greatest discharge of the 1922 flood at Peoria, Illinois, was 56,700 c. s. f. and the gauge height at Peoria at the time the maximum discharge took place was 24.8 feet on the Peoria gauge; that the maximum discharge of the 1922 flood at Havana, Illinois, which occurred on April 20, 1922, was 65,000 c. s. f. and the gauge height at Havana at the time maximum discharge took place was 22.4 feet on the Havana gauge; that the maximum discharge of the 1922 flood at Beardstown, Illinois, which occurred on April 20, was 109,000 c. s. f. and the flood stage was 25.1 feet on the Beardstown gauge. Defendant made proof that the reason that the flood stage of the Illinois River at Beardstown in 1922 was 5.1 feet higher than the flood stage of 1904 notwithstanding that the flood of 1922 was of less volume than the flood of 1904 was on ac-

count of the construction of levees along the Illinois River since 1904. This proof was made by John W. Woermann, United States engineering department; by James R. Fuller of the United States engineering department; by Robert E. Horton; by Roy N. Towl and by Jacob A. Harman. Defendant made proof that the Illinois River below Beardstown which in 1904 had a flood apron more than five miles wide, had been narrowed down by levee construction until at one point it was less than 1,200 feet; that the lower end of the river from Beardstown to Grafton prior to 1904 had a valley from five to six miles wide at the high water plane, which had been reduced by levee construction to from 1,200 to 2,500 feet. Defendant made proof that during the flood of 1904 some 30 to 40 per cent of the flood waters flowed over the bottom lands outside of the river channel; that it was prevented from flowing over the bottom lands in 1922 by reason of the construction of levees among which was the levee of the South Beardstown Drainage District constructed in 1918. Defendant made proof by House Document 276 of the 68th congress which was introduced as defendant's Exhibit 151 that the flow of the Sanitary District of Chicago of approximately 9,000 cubic feet raised the flood level of the Illinois River in 1922, 18 inches at Peoria, 12 inches at Havana and 6 inches at Beardstown. Defendant made proof that the total amount of water that could be put through the canal by actual test was a sustained flow of 9,000 cubic feet per second. Defendant made proof that the effect of the total flow through the Sanitary District canal on the stage of the Illinois River at Beardstown on April 16, 1922, was some four-tenths (.4) of one foot to six and one-half (6½) inches. This proof was made by John W. Woermann of the United States engineering department; by Robert E. Horton; by Roy N. Towl and by Jacob A. Harman. Defendant made proof that

the effect of the discharge varying during the half-hour periods as shown by plaintiff's Exhibit 6 would have no different or other effect on the flood height at Beardstown than if the flow was a constant flow of the average volume per day. This proof was made by John W. Woermann; by Robert E. Horton; by Roy N. Towl; George W. Pickels; and by Jacob A. Harman. Defendant made proof that from 40 to 44 per cent of the water flowing into the Beardstown Reach flowed in from the Sangamon River. Defendant made proof that the tabulations by John Goodell and the conclusions reached by said tabulations were not in accordance with any known theory of hydraulics. This proof was made by George W. Pickels of the University of Illinois, the witness whom John Goodell testified assisted him in making the tabulations and by Robert E. Horton.

Defendant made proof that the matter of ascertaining what the effect of the increment of the Sanitary District of Chicago was upon the flood stage at Beardstown on the 16th day of April, 1922, was a matter that could be determined by a hydraulic engineer; that a less amount would enter the Beardstown Reach than would be discharged from the controlling works; that a computation of the flow into Illinois River from the various tributaries and the canal making an allowance for the waters required to produce the rise in the river there would be 74 per cent of each increment discharged at the Beardstown gauge, and that taking the discharge of the Sanitary District canal at Lockport as shown by plaintiff's witness Goodell as correct, the canal water flowing past Beardstown amounted to 7,315 cubic feet per second or about 7 per cent of the flow past the Beardstown gauge; which had the effect of raising the flood stage at Beardstown on April 16 four-tenths (.4) of one foot. Defendant made proof by the witness George W. Pickels whom the witness

Goodell testified had assisted in the computation that the effect of the increment of the Sanitary District canal on the flood stage of the river would decrease as it passed down the river. Defendant made proof that there was water passing down the canal and through the controlling works which entered the canal at Willow Springs Spillway from the Des Plaines River. Defendant made proof that there were no diurnal fluctuations in the Illinois River at and below Peoria. This proof was made by Water Supply Paper 545 and by the record of the hydraulic gauges kept by the Power Company above and below the dam at Marseilles. Defendant made proof that the Mississippi River had no effect on the flood stage at Beardstown. Defendant made proof that the Chicago, Burlington & Quincy Railroad embankment was outside the boundaries of the drainage district; that there was no contract entered into between the Coal Creek Drainage District and the Chicago, Burlington & Quincy Railroad Company to fill the trestle when the works of the district were originally constructed, but that the contract to fill the trestle was with the drainage district and the contractor; that at the time of the construction of the levee the railroad embankment was lower than the top of the Coal Creek Levee in two places; that the flood waters of the river stood at an elevation of some 12 to 20 inches above the top of the railroad grade at different places at the time that the railroad embankment broke. Defendant made proof that the river rose after the break took place from four to five inches. It made proof that the railroad company began laying sandbags to protect the embankment and prevent its overflow on the 1st day of April; that there were about three hundred men employed; that on April 16 the tops of the sandbags were not more than five or six inches above the water of the river; that by dividing the stretch under different supervisions they

were able to keep just above the water; that the water was right along the top of the sandbags; that the railroad embankment broke at 6:30 o'clock on the morning of April 16, 1922; that the immediate cause of the embankment breaking was a steamboat passing down the Illinois River which threw a wave some two feet high which passed over the sandbags throwing many of them out of place; that the sandbags were continuous from Frederick to the Beardstown wagon bridge; that the Coal Creek District exercised no control over the work of protecting the railroad embankment, and took no part in the work; that the work was performed and paid for by the railroad company. Defendant made a motion at the close of all the evidence to instruct the jury to find the defendant not guilty and submitted with said motion a written instruction, which motion was denied and the instruction refused.

From all of this testimony it is apparent that plaintiff is and has been an engineer since he and his partner Lowe became interested in the lands in question in 1895. Plaintiff and Lowe had had a contract to construct two different sections of the Sanitary canal each of the length of 4,000 feet. Plaintiff knew better than anyone else, the purpose of the channel, and much better than a layman, the effect upon the lands, down the Illinois River, of the diversion of several thousand cubic second feet from Lake Michigan into the Des Plaines and Illinois Rivers. Regardless of this, plaintiff and his partner, while the construction of the canal was in progress, purchased this large tract of land upon or near the Illinois River, the lands then, in the natural state of the river, being subject to its current overflows. Plaintiff and his partner, Lowe, purchased 5,000 acres of these lands,—"all subject to overflow, all of them, at different heights, of course," and plaintiff and his partner, Jesse Lowe, Sr.,—"took the contract of building the levee where the works connected

with the railroad around to the bluffs,'' in the construction of the Coal Creek Drainage District which was organized in 1898. This was not unlawful, but was highly creditable, and we only cite the testimony to show that plaintiff, in the protection of his rights, is to be charged with a greater degree of intelligence than the usual layman, who had spent a lifetime upon a dry farm, finally to be despoiled by a flood of waters unlawfully diverted upon him, in the interest of the health of the people of the City of Chicago. Even in this situation plaintiff is entitled to the full protection of all the law.

We understand that plaintiff testified that in 1895 or 1896 a Mr. Briggs pointed out to him the high watermark of the flood in the Illinois River, at Beardstown, in 1844, by a nail then driven in a tree, just below the bridge at Beardstown, in the vicinity of these lands, the point being 22½ feet above the low watermark of the stream. It was shown by conclusive proofs that in 1904 there was a flood of waters down the Illinois River, greater in volume than the flood of 1922, upon which this suit is founded. At the Beardstown bridge, in the immediate vicinity of the lands in question, in 1904, a volume of water in which the waters of the Sanitary District were mingled, to the extent of 115,000 cubic feet per second, poured under the bridge and raised the river to the height of 20 feet above the low watermark. This did not reach the high watermark of the flood of 1844, assuming that the area of the flood was within the same territory.

Again in 1913 a flood poured down the Illinois River from all the various sources, including the Sanitary District channel, raising the waters under the Beardstown bridge to 21.75 feet above low watermark. At the flood in question, in April 1922, the volume of the water passing under the Beardstown bridge was 109,000 cubic feet per second and it raised the water to a height of

25½ feet on the Beardstown gauge. Plaintiff during the trial testified that they suffered another flood in 1926 and that the waters in the Illinois River, both at low water and high water, from 1910 and 1915 had been manifestly higher than they were from 1900 to 1910 and 1915. The reason for the raise of water, to a greater height (5½ ft.) in the flood of 1922, over the height in 1904, was fully explained by the witness Fuller and others. It was shown that prior to 1904 there were a very few drainage districts and levees along the Illinois River, and those constructed were mostly above Beardstown and below, down near the mouth of the stream. In 1904, as shown by the testimony, the river at Beardstown—below Beardstown, was approximately five miles wide, and a short distance below the Beardstown bridge, the flow went down through what is known as North Lake or Fish Lake and a part of it came back into the river at Indian Creek; also a large part went down the river through Meredosia Bay. In the intervening years between 1904 and 1922, other drainage districts had been established, walls, levees and dykes, like the dam and wall constructed by plaintiff for the Chicago, Burlington & Quincy Railroad had been established, and much additional overflowed lands had been recovered, so that below Beardstown the width of the river had been contracted to a little less than 1,200 feet for the flowage area of the water and by the reduction of the cross section at this and other points, it caused the rise in the level of the water. This new construction had been made at many places down the river below Beardstown. The record is full of undisputed testimony as to this situation and by the simplest arithmetic, determines the increased height of the waters in 1922, to which the railroad grade and levee, which was constructed by plaintiff for the protection of the Coal Creek District contributed. These structures and the changes made

in the area of the Illinois River are not chargeable to the defendant. Section 19 of the Chicago Sanitary District Act, Cahill's St. ch. 42, ¶357, provides: "Every Sanitary District shall be liable for all damages to real estate within or without such district which shall be overflowed or otherwise damaged by reason of the construction, enlargement or use of any channel, ditch, drain, outlet or other improvement under the provisions of this act"; plaintiff cannot now sue for the construction or enlargement of the channel, a permanent structure, which has been in existence and substantially unchanged for nearly 30 years.

As to the use of the channel, plaintiff grounds his case upon the theory that the flood of 1922 was the first invasion of the waters of this district upon his lands. We cannot agree with this contention. Plaintiff's lands must be taken in the condition they were in in 1900 and in the recurrent conditions that existed during the periods thereafter. Prior to the operation of defendant's district the lands had been overflowed lands and practically in a state of nature. In 1898 the lands were improved by a levee running in a southwesterly course following the bank of the river for 400 or 500 feet and beyond the bank for about four miles, then it turned due north until,—"it reached the high point 'on the bluff.' From that point clear up to a distance of about four miles there is a bluff ditch built." Coal Creek was diverted around the district. There was a levee all along the river to a height of 103 and 104,—"on our elevation," datum at 100 being 22.5 feet above low watermark of the Illinois River, the height of the 1844 flood. "This levee was first constructed and the district enclosed and completed in 1898." The railroad was there at the time the district was formed and on the east side, nearest to Frederick, the protection of the district was the Chicago, Burlington & Quincy Railroad embankment from the river up

to Frederick, except about one-fourth mile of trestle, which was filled in by the railroad company and the embankment raised. Plaintiff's lands lay inside of this embankment and levee and plaintiff had just commenced the improvement of the lands. This was the situation on January 17, 1900, when the defendant turned the waters of Lake Michigan into the Illinois River.

"The works of the district and the levees of the district were afterwards raised to a higher elevation in 1909, again in 1913 and after the flood of 1922."

It would seem to be an axiomatic fact that plaintiff's rights were invaded, whenever the waters of the Illinois River, commingled with the waters of the Sanitary District attacked, flowed against, or attempted to batter down or destroy the levee or dam, which was the protection of plaintiff's lands and plaintiff had the option at any time, after the invasion existed, to provide for his own protection, or to bring suit against the defendant, for permanent damages to his lands, within a period of five years. This he did not do, but in 1904, he and others increased the height of their levee and dam. It may be that the remedy would have been with the Coal Creek Drainage District, to secure assistance in the maintenance of its levees, but that is not important here. Again in 1913, after plaintiff's rights had been twice invaded and assaulted, its levees, dams and protections attacked by these waters, still plaintiff, with the district, seeks his own protection and makes no complaint about the increase or the flow of waters from defendant's canal.

Plaintiff himself has testified to the increase of the flow of water in the river from 1910 and 1915 on, with no proof that there was any increase in the flow from defendant's channel from the year 1915 to the commencement of this suit and there being no other testimony in the record that there was an increased flow, it

must be held that plaintiff's cause of action more than five years having passed, after any increased flow could have commenced, is barred by the statute of limitations.

In *Schlosser v. Sanitary District*, 299 Ill. 77, 82, the court held: "The drainage canal is a permanent structure whose use and operation in the manner authorized by law were necessarily injurious to the appellee's land. The declaration did not complain of the manner of construction, operation or use of the canal or the works connected with it or of any negligence of the appellant, but alleged a permanent injury to the appellee's land caused by the existence, operation and use of the canal in the manner authorized by law. For such injury the person injured must recover all damages which he has sustained or will sustain in the future from the operation of the canal in the manner and to the amount then authorized by law in a single suit, and that suit must be brought within five years after the completion of the work and putting it in operation. (*Suehr v. Sanitary District*, 242 Ill. 496; *Vette v. Sanitary District*, 260 Ill. 432; *Shaw v. Sanitary District*, 267 Ill. 216; *Wheeler v. Sanitary District*, 270 Ill. 461.)"

And the court further held in the same case: "The parties by their pleadings in this case have raised the issue of the limitation of the action, not with reference to the time when the work was completed and put in operation but with reference to the time when the appellee's land was actually invaded by the waters of the district. It is not material that the water did not at once render the land useless. If the flow of water in the river was increased, the cause of action was complete, as we have held, when the work was complete and put in operation. The limitation under the pleadings in this case, however, began to run when the increased flow of water reached the appellee's land, and he was bound to sue within five years of that time, not only for all the damages which he had sustained

but for all which he would sustain thereafter or be barred from maintaining any action." See also *Coal Creek Drainage Dist. v. Sanitary Dist., supra.*

In this case we hold, that when the increased flow of water reached the levee and dam of the Coal Creek Drainage District and endangered it, as it is claimed it did in 1904 and again in 1913, requiring a raising of the dam and levee to a higher point to protect the lands of the district, including plaintiff's lands, causing additional assessments against plaintiff's lands to raise the levee, it was a distinct injury to plaintiff's lands, if such was the fact, and the increased flow of water had reached plaintiff's lands and his cause of action was complete. *Schlosser v. Sanitary District, supra.* This view of the law is materially accelerated by plaintiff's testimony in estimating the permanent damages to his land. He was permitted to testify that there had been assessments spread on the land ever since the district was organized. He testified:—"Yes, there have been annual assessments and four or five special assessments."

The other chief element of permanent damage taken into consideration by plaintiff in his testimony was: "The prejudice that exists against that property now on account of that flood".—

"Q. Well, what do you think caused the decline of the market value of those lands?

A. Why, the fact that that land was overflowed there and that the people are afraid of it.

Q. Yes, they were about getting over that prejudice of 1913, is that correct?

A. Well, getting over the prejudice of levees in general and high water. They were getting kind of used to it.

Q. And then when the river rose to the elevation that it did in 1922, it created another prejudice, is that right?

A. It certainly did, it did.

Q. So the matter of the decline in the market price of the land was due to those prejudices created, as you say, by higher stages of water, than by the physical condition of the land?

A. Well I think so and then that invasion, of course, was what did it, and the increasing high waters.

A. The fact the land was overflowed in 1922, the enormous cost for the land to bear for its part in putting it back in shape again. The fact the river is almost yearly now getting to an unprecedented height and people are frightened to invest in that kind of property. You can't interest them.''

As to tenants:

"The witness: Of course they all moved out in 1922 and very few of the old tenants came back. We got some new ones and they are leaving; this 1926, this last year's high water, every one of them moved out and not any of them are coming back." "The enormous cost for the land to bear, for its part in putting it (meaning the embankments and dykes) back into shape again," coupled with the testimony as to continual assessments and that "people are frightened to invest in that kind of property" shows a condition that has continually existed since the flood of 1904, which indicates an invasion of plaintiff's rights for nearly 20 years, during which time, if his testimony is true, plaintiff has always had a cause of action.

The testimony was that the crops in 1922 and 1923 were good crops, except that in the summer of 1923 it rained continuously during the harvest season and much of the crop was not recovered. The principal element of damage as testified to by plaintiff, was the breakage and loss of about 25 per cent of his lateral tiling and some injury to the buildings.

It is not shown by any testimony in this case, that the defendant increased its flowage of water or sewage into the Sanitary Canal, after the year 1915. It is not

shown by any testimony that the defendant diverted any of the waters of Lake Michigan into the Sanitary Canal further than was proper and necessary to dilute the sewage, for which the district was formed. To charge that the flood rise to 25.1 feet at Beardstown, in April 1922, of the Illinois River, was due to any added waters from the Sanitary District, is purely speculation and imagination, in view of the uncontroverted testimony as to the organization of drainage districts along the Illinois River and the narrowing of its channel at and below Beardstown. Formerly the Illinois River, below Beardstown, spread out, over the bottoms, in one place, into a 7-mile channel.

Many other errors are pointed out and argued, many of which should be sustained, but we have only attempted to take up the main substantial questions, necessary to a determination of the issues in the case, and based upon the intelligence which we possess, we have given to this cause our best understanding.

Complaint is made, as to the remarks of counsel for plaintiff, in the presence of the jury, as follows: "I imagine that the taxpayers of the City of Chicago, of this district, in my opinion I may be wrong, but I imagine they could spend their money to a better advantage in paying this landowner here, and maybe some more for all I know, with some of their taxpayers' money, instead of hiring all the experts they can get at $100 a day, and keep you and I here for a month. They could do it to better advantage than going out and buying experts." "I think, gentlemen, they can spend some of their tax money to a better advantage that way than hiring experts to come and give the sort of testimony that some of them gave." "I would rather believe a fellow of that kind, gentlemen of the jury, than forty fellows that were getting on the stand and earning their money at $100 a day, testifying in a lawsuit and selling their testimony." "Every one of them

except one, every one except two, one gets $50 a day and the other gets $25; gets more money than all of you people together a day (addressing the jury); and you have to pay your expenses and the Sanitary District has to pay theirs." "The statute directs these people to use a certain amount of water to dilute the sewage; if they have used it for any other purpose they have violated the organic law of the organization of the district."

It is true, as it is argued by counsel, that it is proper to present and argue the amount of an expert witness fee, but the remarks of counsel, as cited, are not argument, but inflammatory statements made to prejudice the jury and are sufficient to warrant a reversal of the verdict and judgment. The reference to the fee of jurymen was demagogic and is very properly criticised.

The circuit court of Schuyler county erred at the close of plaintiff's case, and again at the close of all the evidence, in refusing to instruct the jury to find a verdict for the defendant. It follows, that the verdict and judgment of the circuit court of Schuyler county should be reversed, with a finding of fact.

*Reversed with a finding of fact.*

The clerk will enter as a part of the judgment of this court, the following finding of fact:

We find as a matter of fact, that the defendant, the Sanitary District of Chicago, did not overflow or otherwise damage the lands of the plaintiff, by reason of the construction, enlargement, or use of any channel, ditch, drain, outlet or other improvement.